**Kenneth J. ARENSON, Plaintiff–Appellant,**

v.

**SOUTHERN UNIVERSITY LAW CENTER, B.K. Agnihotri, and Aaron Harris, Defendants–Appellees.**

No. 89–3898.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1990.

S. David Holladay, Baton Rouge, La., Harland M. Bitz, Britz & Zemmelman, Toledo, Ohio, for plaintiff-appellant.

David G. Sanders, Asst. U.S. Atty., Cleveland Ray Coon, Asst. Atty. Gen., Corrections Div., Baton Rouge, La., for defendants-appellees.

Before THORNBERRY, GEE, and SMITH, Circuit Judges.

GEE, Circuit Judge:

Plaintiff Kenneth J. Arenson won a $65,000 jury verdict against Chancellor B.K. Agnihotri and Professor Aaron Harris of the Southern University Law Center for their violations of 42 United States Code §§ 1981 and 1983. The district court granted a judgment notwithstanding the verdict for the defendants. We conclude that the record contains sufficient evidence such that a reasonable jury could find for the plaintiff, and thus reverse the judgment of the district court and reinstate the jury's verdict.

*Facts*

Southern University in Louisiana was at one time required by law to be an all black institution. Today, the university population remains overwhelmingly black, but the student body at the law school is about 40% white and the law school faculty has a slim majority of black professors. The facts, read in a light most favorable to the jury's verdict, tell the story of Mr. Arenson's attempts to be placed on the coveted "tenure track" at the Southern University Law Center ("SULC").[1]

B.K. Agnihotri, chancellor of the law center, hired Mr. Arenson, a white lawyer with no teaching experience, as a visiting assistant professor for the 1985 spring semester. Chancellor Agnihotri informed Mr. Arenson that his position was a temporary one and that he could not acquire credit toward academic tenure in a visiting professor position. In March 1985, SULC renewed Mr. Arenson's contract for the fall 1985–86 academic year and hired him to teach the 1985 summer session.

At the end of the 1985 academic year, the university terminated Professor Loretta Lyles, who had occupied a tenure track

---

1. A tenure track teaching position is one that can lead to "tenure" after a certain number of years of teaching experience. A professor who achieves tenure cannot be removed from his position unless good cause is shown.

position. In September 1985, Jesse Stone, a former dean of the law school and former president of the university, returned to the faculty as a full professor. Another tenure track professor, J. Homes Armstead, did not obtain a renewal of his contract after the 1985–86 academic year. Mr. Arenson testified that in late 1985 Chancellor Agnihotri told him that he might qualify for the tenure track position opened by Professor Armstead's departure.

In the spring of 1986, the Commissioner of the Louisiana State Board of Regents wrote to the President of Southern University, informing him that the Governor of Louisiana intended to reduce the budgets of all higher education institutions by twenty percent. The president sent a copy of the letter to Chancellor Agnihotri. The law center prepared proposed budget cuts, but the reductions were never actually imposed. Evidence introduced by Mr. Arenson showed that the SULC budget actually increased each year.

In February of 1986, Mr. Arenson wrote to Professor Aaron Harris, Chairman of the law center's Tenure and Promotion Committee, requesting that he be granted a teaching position that could lead to academic tenure. Mr. Arenson did not send a copy of this letter to Chancellor Agnihotri, but the chancellor learned of the letter several months later. Professor Harris responded in April of 1986 that he was "of the impression that it is in your [Mr. Arenson's] best interest not to present this matter to the committee at this time due to the depressed budget."

Around the time Professor Arenson made his request for a tenure track position, Evelyn Wilson, a young black lawyer, interviewed with SULC for a position as legal writing instructor at the law center.[2] The law center hired Ms. Wilson in June of 1986 to teach legal writing, at a salary significantly below that of other instructors, including that of Mr. Arenson. Chancellor Agnihotri at that time informed Ms. Wilson that her position was a tenure track position.

Mr. Arenson made a second request for a tenure track position in August of 1986. Chancellor Agnihotri became aware of Mr. Arenson's earlier request to Professor Harris at this time. A third request in September went unheeded by the Faculty Appointments Committee until the end of the month, at which time the chancellor wrote Mr. Arenson that the Committee had decided to deny his request for a tenure track position and further voted not to renew his visiting position beyond the current year. Chancellor Agnihotri noted in his letter that he concurred in the committee's decision. The minutes of the committee meeting were not offered into evidence, but it is undisputed that both Chancellor Agnihotri and Professor Harris attended the meeting and were members of the committee. The evidence also established that the chancellor informed the committee prior to their vote on Mr. Arenson that no tenure track positions were available.

The record contains some evidence that Professor Harris on several occasions expressed the view that maintaining a racial balance on the faculty was desirable, including remarks that the faculty already had too many white law professors.

*Procedural History*

After learning that his contract would not be renewed, Mr. Arenson sued Southern University and three of its law faculty members under 42 U.S.C. §§ 1981 and 1983 and under Title VII, 42 U.S.C. § 2000e et seq. The district court granted the university's motion for summary judgment on grounds of eleventh amendment immunity. At the close of evidence at trial, the district court granted a directed verdict in favor of one of the faculty members, professor Donald J. Tate. The jury found against the two other defendants, Professor Harris and

---

**2.** Admission criteria at SULC are less stringent than those of other Louisiana law schools, and legal writing was an area where many students suffered difficulty. When Ms. Wilson interviewed for the job, legal writing was being taught by Ms. Marie Augustus, who was Director of Alumni Affairs and not a member of the faculty. SULC hired Ms. Wilson after concluding that it would be beneficial to have a permanent legal writing instructor for the school.

Chancellor Agnihotri and awarded $65,000 in damages. The court granted a judgment notwithstanding the verdict for the defendants and, as the damages findings were advisory to the Title VII equitable claims, the court dismissed all of Mr. Arenson's claims. Mr. Arenson now appeals the judgment in favor of Professor Harris and Chancellor Agnihotri.

### Standard of Review

We apply the same standard of review as that of the district court in determining whether a directed verdict or a judgment notwithstanding the verdict is proper. *In re Letterman Bros. Energy Securities Litigation*, 799 F.2d 967, 972 (5th Cir.1986). We set forth that standard in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

■ To prove an employment discrimination claim, a plaintiff must show: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden of establishing a prima facie case, however, is "not onerous", but only requires proof that the plaintiff applied for an available position for which he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). After the plaintiff establishes his prima facie case, "the burden shifts to the defendant ... to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95 (citations and footnotes omitted). In the case before us today, however, the defendants do not contend that the plaintiff was denied tenure for a legitimate reason.[3] Their main contention, and that adopted by the district court in granting its judgment notwithstanding the verdict, is that a tenure vacancy did not exist.

■ We conclude that a reasonable jury could have determined that a tenure vacancy did exist but was denied to Mr. Arenson for a discriminatory purpose. The departures of Professors Armstead and Lyles, together with the offer of tenure to Ms. Wilson—who had less experience than Mr. Arenson—and Professor Harris's comments about the need to maintain a black majority on the faculty provide some evidence that tenured positions were available to black applicants but not to Mr. Arenson. The jury was entitled to weigh Chancellor Agnihotri's testimony about budgetary concerns against the evidence offered by Mr. Arenson that the law center's budget actually increased during the time when he made his several requests for tenure. The defendants offered little evidence from which the jury could infer that a legitimate reason existed for denying Mr. Arenson a tenure track position, but some evidence

---

**3.** The record contains student testimony offered by the plaintiff that Mr. Arenson was an "excellent teacher." The defendants make no serious effort to rebut this, save for testimony by Professor Harris as to Mr. Arenson's "quirky" behavior.

existed that the defendants denied him the position for a discriminatory purpose. In close cases such as the one we decide today, we must allow the jury's determination of the facts to stand. We hold that the record contains enough evidence to support the jury's verdict and therefore reverse the judgment of the trial court.

REVERSED.